IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SUSAN BLUE,

                 Plaintiff,                    OPINION AND ORDER

    v.
                                               09-cv-395-wmc

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS—LOCAL 159,

                 Defendant.

---

Plaintiff Susan Blue had what could be described as a rocky relationship with her immediate manager at defendant International Brotherhood of Electrical Workers–Local 159, Billy Harrelson, made worse when she actively opposed his reelection to that position. Even so, Blue claims things only turned ugly after she questioned whether Harrelson had denied union membership because an applicant was black. Blue eventually brought this lawsuit claiming Local 159 had retaliated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3, and 42 U.S.C. § 1981. Defendant Local 159 has filed a motion for summary judgment. Dkt. #18. Because plaintiff has presented evidence raising genuine issues of material fact about whether defendant retaliated against her for speaking out against alleged racial discrimination, defendant's motion will be denied.


UNDISPUTED FACTS

Viewing the facts in a light most favorable to plaintiff, the following facts are material and undisputed for purposes of summary judgment:

## I.     Blue's Job and Relationship with Harrelson Before 2006

In July 1978, Susan Blue began working for Local 159 as an administrative assistant/union secretary.  The core and most fulfilling part of Blue's job duties involved assisting members of Local 159.

Blue is herself a member of the Office and Professional Employees International Union–Local 139.  During all times relevant to this lawsuit, Blue's employment with Local 159 was governed by the employment contract she signed on August 22, 2005, which governed until July 31, 2008.

Billy Harrelson[1] was elected as the business manager for Local 159 in 2001.  Blue had worked with Harrelson before in his capacity as Local 159's business agent and had questions about his ethics, though she still implicitly supported Harrelson's election because of her deteriorating relationship with the then business manager.  Whether or not Harrelson

---

[1] Sadly, Mr. Harrelson passed away in October 2007.  Because he is deceased, defendant suggests that statements by Harrelson adverse to defendant's interest would be inadmissible as violating Wisconsin's deadman statute.  *See* Wis. Stat. § 885.16.  Defendant, however, fails to explain why a state statute applies in this case where no state law is at issue.  *See Lovejoy Elec., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989) (deadman laws may apply in federal diversity cases if state law supplies the rule of decision).  While defendant is free to attack the credibility at trial of statements attributed to Harrelson as Local 159's agent, such evidence is undisputed at summary judgment because no federal statute bars its admission.  *See Savarese v. Agriss*, 883 F.2d 1194, 1200 n.10 (3d Cir. 1989) ("Appellees correctly conclude that the Pennsylvania Dead Man's Statue would not apply to this federal claim."); *Longoria v. Wilson*, 730 F.2d 300, 204 (5th Cir. 1984) (because case was "a federal question-based civil rights inquiry under § 1983," Texas Dead Man's Statute is inapplicable).  *See also Firscher v. Forestwood Co.*, 525 F.3d 972, 984-85 (10th Cir. 2008) (citing *Savarese*, 883 F.2d at 1201); *White v. Honeywell, Inc.*, 141 F.3d 1270, 1277 (8th Cir. 1998) (in a Title VII racial discrimination case, death of party-opponent's agent did not make agent's statement inadmissible; instead, agent's death and the inability to cross-examine goes to the statement's weight).

2

was aware of Blue's concerns about him, he proceeded to change Blue's job title from office manager to administrative assistant after his election. This change in title resulted in a minor change in duties. As the office manager, Blue had supervisory power over the clerical staff. After her title was changed to administrative assistant, Harrelson alone exercised supervisory power over the clerical staff.

In 2004, Harrelson had to run for re-election to the business manager position. Mark Hoffman ran against Harrelson. Blue informed union members that she preferred that Hoffman win that election. She opposed Harrelson's re-election because she believed he was dishonest and did not respect him. Blue made her opinions about Harrelson, his character and his job performance known to the members of Local 159. Harrelson, nonetheless, won the election.

Unsurprisingly, the tone in the office suffered after Harrelson's re-election. From Blue's perspective, Harrelson's attitude in particular had changed by late 2005. He appeared impatient, self-absorbed and acted as though he could do whatever he wanted. Blue believed that Harrelson lied to people. She also had concerns about decisions he was making as business manager.

At some point, Blue went so far as writing a letter to her coworkers about "the negativity and downgrading that has become common place in our office" acknowledging that she had been part of the problem, promising to do better and urging others to do the same. Blue did not send that letter to Harrelson or speak with him about her concerns, though he became aware of it through a coworker.

3

## II.    The January 27, 2006 Conversation

On January 17, 2006, Alexander Phillips filed a race discrimination complaint against Local 159, alleging that he had been denied union membership because he was black. According to Phillips, despite having passed the journeyman test, paying his initiation fee and signing the referral book, his name was crossed out of the book and his fee refunded. Blue opened the mail containing the complaint and passed it on to Harrelson.

Ten days later, Ryan Dzuibla, a white union member, came into Local 159's office to pay his initiation fee even though his name was already in the referral book and he had been working for several months.  Later that day, Blue asked Harrelson and two union business agents why Dzuibla was permitted to sign the referral book without paying his initiation fee and Phillips' name was removed from the book even though he had paid the fee.  Blue told them that what they were doing was discrimination and it would raise a red flag with the Madison Equal Opportunities Commission (MEOC).  Harrelson told Blue that he did not want to take Phillips' money and put his name in the referral book because Phillips would have to wait a long period without work.  Blue pointed out that there was not a long wait for work in the referral book.

## III.    Changes in Treatment at Work

After the conversation, Harrelson became openingly hostile and began intimidating Blue, including using a loud or angry tone when speaking to her, and shaking his finger at her.  There were also several occasions after the January 27 conversation when Harrelson

4

would go to speak with Local 965's business manager, Shawn Reents, about firing Blue. Local 965's office administrator, Betsy Pape, overheard Harrelson saying, "I need to get her out of her[e]" and "I need to fire her.  How can I do it?"[2]

Until the January 27 conversation, Blue had served as Harrelson's administrative assistant for four and a half years without his ever criticizing Blue about her job performance or having to ever discipline Blue for job performance issues.  Even after Blue's job title was changed in 2001, Harrelson had never limited Blue's interaction with union members, the apprenticeship office or the benefit fund.  Prior to the January 27 conversation, none of Blue's job responsibilities had ever been removed or reassigned, other than her supervisory authority over office staff.

Before Blue expressed her opposition to how Phillips was treated, she also had friendly relationships with most co-workers.[3]  After Blue expressed support for Phillips' discrimination case, employees no longer greeted Blue in the morning or acknowledged her when she left for the day; Blue felt shunned and isolated.  From early 2006 into 2007, Harrelson began holding private office meetings, excluding only Blue.

---

[2] Defendant contends that such statements are "inadmissible hearsay as to third party".  Def.'s Obj. to Pl.'s PFOF, dkt. #38, ¶73.  Ms. Pape's first-hand reporting of Harrelson's statements, however, constitute statements by a party-opponent, which are not hearsay.  Fed. R. Evid. 801(d)(2)(D).

[3] Defendant has proposed facts about Blue's poor relationship with Trisha Hallman, including that Hallman quit her job with Local 159 because of Blue.  Def.'s PFOF, dkt. #23, ¶¶58-74.  While Blue does not dispute that Hallman and she were not on good terms, that admission alone does not support defendant's contention that no one was friends with Blue because she was always trying to start trouble.

Several days after the January 27 conversation, Harrelson had a meeting with Blue and her union representative because he wanted to discipline Blue for being tardy. Harrelson wanted Blue to work from 8 a.m. to 4:30 p.m. each day. During the meeting, Harrelson became furious when he learned that Blue's employment contract did not permit him to set Blue's hours of employment, but instead required that she work eight hours between 7 a.m. and 5 p.m. For years Blue had arrived at work between 8:15 and 8:45 a.m. and worked an eight hour day without having ever been warned or disciplined for being tardy.

That same day, Harrelson called Blue into his office and directed her to stop opening mail, entering his office uninvited, talking to anyone at the benefit fund office, processing applications for pension or death benefits and answering members' questions about their benefits. Despite Blue having previously always been the office person for the apprenticeship program, Harrelson also told Blue that she was no longer permitted to speak with anyone at the apprenticeship office, to assist apprentices with their applications or to answer apprentice questions about benefits, dues payments or training.

Blue's previous job duties of coordinating training and scheduling classes were given to another employee, Sheryl Schreiber, a union organizer and electrician. In February 2006, Harrelson also began re-assigning some of Blue's other job duties: (1) re-assigning Blue's duties of typing general office documents, sending out meeting notices and deciding about ordering office supplies, and (2) removing Blue from the Audit committee, which she had been a part of since 1998. The following month, Harrleson enlisted the help of Schreiber

in hiring a new administrative assistant for Local 159's office. Even though Blue had hired every new office staff person over the last eight years, she was excluded from this hiring process.

Once the new assistant, Linda Hendrickson, was hired, Harrelson had Schreiber and business agent Michael Killian train the assistant, even though Schreiber and Killian had never performed and had little or no experience with the assistant's job duties. In the past, Blue had been solely responsible for training new clerical staff.

Sometime in March 2006, Blue called the president of Local 159, Joe Spataro, and asked him if Harrelson had told the Executive Board about the Phillips case. Spataro told Blue that he had never heard about the case from Harrelson but that he would look into it. Within a week, Spataro came into the office to speak with Harrelson about the case.

Blue took time off from work on Thursday and Friday, March 16 and March 17, 2006. When she returned to work on Monday, March 20, she found that someone else had opened her emails. She had never had her emails opened by another employee before.

On March 20, 2006, the MEOC sent questionnaires concerning the Phillips case to the Local 159 office. The next day, Blue, Harrelson, Eggleson, Schreiber and Killian received the questionnaires and Harrelson directed the office staff to turn their responses in to Local 159's attorney, Kurt Kobelt. Harrelson called Blue into his office and said, "I'm not suggesting, I'm telling you not to answer those questions without going through our attorney." Except for Blue, everyone in the office turned their responses to the questionnaires in to Kobelt. Blue provided her responses directly to the MEOC and

provided a copy to Kobelt.  Harrelson never questioned or confronted her about her responses.

A couple weeks later, on April 5, 2006, Harrelson issued Blue a written warning for insubordination; the warning stated that Blue had failed to follow procedures because she had been warned about working with members on trust issues as opposed to sending them to the trust office and she had been emailing with a member regarding a trust issue.[4]

On April 6, 2006, Blue filed a complaint with the MEOC, alleging that Harrelson was retaliating against her for participating in Phillips' case and for opposing Local 159's allegedly discriminatory hiring practices.

On May 4, 2006, Harrelson issued Blue a directive that she work from 8 a.m. to 4:30 p.m. with a half hour unpaid lunch.  Harrelson issued this directive because he encountered "numerous occasions" when union members wanted to speak with Blue and no one knew when she would arrive for work.  Blue was unaware of any members coming to speak with her and being unable to get a hold of her.

During the month of May 2006, the union membership voted to give Blue a watch for her 28 years of service.  As business manager, Harrelson refused to order the watch. Later that month, the Executive Board voted to purchase a $100 gift certificate for Blue instead of the watch, but Harrelson never purchased the certificate either.  During that same month, Harrelson ignored Blue's requests for time off and training, even though

---

[4]  A settlement of this grievance was filed on May 4, 2008, reducing the written warning to an oral warning and withdrawing the grievance with prejudice.  Blue had not been handling a pension trust issue and was found to not have been insubordinate.

Hendrickson, the other administrative assistant, was provided several training opportunities, including one in Washington D.C. that involved training on Blue's specific job duties.

It was also during May 2006 that Blue was directed not to work any overtime without first obtaining authorization from Harrelson. Before May 2006, Blue had been allowed to work overtime whenever necessary without first obtaining permission and her overtime ranged from two to four hours a month at $38.48 an hour. After the May 2006 overtime directive, Blue was not allowed to work any overtime, while Hendrickson was. In particular, Hendrickson worked approved overtime when Blue was on vacation, even though Blue was not permitted to work overtime when Hendrickson was on vacation.

Harrelson also issued Blue a written warning on June 28, 2006, for "excessive tardiness." The record of discipline noted that Blue had been tardy on June 14, 20, 21, 26 and 28 and that Harrelson had verbally warned Blue about being late on June 26. On Blue's time records, which Harrelson signed, she is noted as arriving at work at 8 a.m. on June 20, 21 and 28 and at 8:05 a.m. on June 26. In August 2006, Harrelson directed Blue to change her time sheets to remove any overtime she worked and to punch in at 8 a.m. and out at 4:30 p.m. regardless of whether she actually came in early or stayed late to complete work. Although Blue worked past 4:30 p.m. on many occasions after this directive, she was not paid for that time.

On February 14, 2007, the MEOC provided Local 159 with notice, that it was scheduling a public hearing on Phillips' race discrimination complaint. Two days later, Harrelson called Blue into his office and issued her four warnings. All four were unwarranted.

9

The following month, Harrelson met with Shari Brunner, the secretary for an electrical contractor association that worked with Local 159, and told her he was having "personal issues" in his office and that she was no longer allowed to be friends with Blue or even speak with Blue.  Later, on March 26, Harrelson suspended Blue for five days without pay for "insubordination," because she had asked for waiver of reinstatement fees for union members without Harrelson's permission, contrary to prior warnings.  Blue had not received any prior warnings; nor had Harrelson given her a consistent policy on waiver of reinstatement fees.  Blue's suspension was also not issued in accordance with the steps of progressive discipline as set forth under her union contract, which required an oral warning, followed by a written warning and then disciplinary suspension before any suspension was issued.

Four days later, Harrelson issued Blue an additional four day suspension for further insubordination for changing her voicemail to indicate she was serving a five-day suspension at Harrelson's direction, as well as changing and failing to leave her password so that the message could be removed.  When Hoffman became the business manager in July 2007, he rescinded the first suspension as given without just cause and rescinded the second suspension because it would not have occurred without the unjustified first suspension.

Blue went to UW Health on April 4, 2006, and was treated for elevated blood pressure and uncontrolled anxiety due to work related stress.  She was then placed on 90-day disability leave effective April 9, 2007.  She returned from leave on July 16, 2007, when Hoffman was the business manager for Local 159.

10

OPINION

At summary judgment, plaintiff must "show through specific evidence that a triable issue of fact remains on issues for which [she] bears the burden of proof at trial[;] the evidence submitted in support of [her] position must be sufficiently strong that a jury could reasonably find for [her]." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted). While plaintiff has brought a retaliation claim under both Title VII and § 1981, the analysis of those claims involves the same standard. *See Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) ("We apply the same elements to retaliation claims under Title VII and § 1981.").

Blue's claims are premised on her contention that Local 159, through its business manager Billy Harrelson, unlawfully retaliated against her for speaking out and filing a complaint against Local 159 for racially discriminatory practices. To defeat defendant's motion for summary judgment, Blue uses the direct method of proof.[5] Under the direct method, Blue must show that: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action taken by the employer; and (3) there was a causal connection between the two." *Hobbs v. City of Chicago*, 573 F.3d 454, 463 (7th Cir. 2009) (citation omitted).

The parties agree for purposes of summary judgment that the first prong is satisfied: Blue engaged in protected activities when she raised concerns about discriminatory

---

[5] Plaintiff specifically denounces proceeding under the indirect method. *See* Pl.'s Br., dkt. #33, at 2 n.1. Accordingly, the court considers plaintiff's claims under the direct method only.

11

treatment on January 27, 2006, and on April 6, 2006, when she filed her own charge with the MEOC against Local 159 for retaliation. They disagree about the satisfaction of prongs two and three.

### A.     Material, Adverse Actions

The Supreme Court has explained that protecting employees from retaliation for reporting discriminatory conduct is intended to "protect[ ] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A plaintiff receives this protection when he or she shows "that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation omitted). This is an objective standard. *Id.* Its application, however, "will often depend upon the particular circumstances." *Id.* at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."). Application of this standard is intended to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 70.

The Supreme Court has noted that claims for unlawful retaliation cannot be used to "immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68. Hence the *material* requirement in the

objective standard. In other words, actions like staring or yelling at an employee, ordering minimal changes in an employee's job responsibilities or even ordering the lateral transfer of an employee to a new position by themselves may not be materially adverse to a reasonable employee. *See, e.g., Stephens*, 569 F.3d at 790 (intimidation by staring and yelling at employee, physical isolation of employee and minimal alteration of job duties not materially adverse); *cf. Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 480 (7th Cir. 2010) (purely lateral move to new position not adverse employment action).

The Seventh Circuit has separately cautioned that "an act that would be immaterial in some situations is material in others." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005). As the Supreme Court stated, "Context matters." *White*, 548 U.S. at 69. This leaves open the possibility of "a cognizable claim of retaliation based on acts which, although seemingly appropriate and nondiscriminatory in isolation, bespeak retaliation when considered together." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 n.7 (7th Cir. 1996).

Defendant contends that the only possible materially adverse actions Blue suffered were her suspensions, because all other adverse actions Blue complains about were trivial or minor annoyances. But when viewed in a light most favorable to Blue, a jury could find that a number of other actions she was subjected to between February 2006 and April 2007 would have dissuaded a reasonable employee from supporting a charge of discrimination, at least cumulatively if not individually.

In beginning the analysis, it is important to highlight the relevant circumstances before deciding on the significance of the harms. Proper application of the objective

13

standard requires that the "reasonable employee" be in the same circumstances as Blue. For the 28 years before February 2006, Blue's work performance had never been criticized and she had never been disciplined verbally or in writing by the business managers she worked for, including Harrelson for whom she had worked the previous four and half years.[6] Even though Harrelson changed Blue's job title in 2001, he did not remove her core job duties that involved interaction with union members. Harrelson also did not criticize or discipline Blue before February 2006, even though she openly opposed his reelection to the business manager position in 2004 and had questioned his veracity and leadership. Finally, one cannot ignore the fact that Blue's actions in speaking out against the alleged racial discrimination at Local 159 could be seen by a jury as altruistic, rather than self-interested, at least when viewed in a light most favorable to the plaintiff. *See*, *e.g.*, *Washington*, 420 F.3d at 661-62 ("If instead of seeking money for himself the employee supported a colleague's charge of discrimination, however, [moving that employee from a 100-square-foot cubicle to a 70-square-foot one] might induce the employee to withhold support; it takes less to deter an altruistic act than to deter a self-interested one.").[7]

---

[6] This is not to ignore evidence of pre-protected activity that Blue may have been a challenge to manage and with which to work. Indeed, Blue had substantial issues with the business manager who preceded Harrelson, as noted. Blue even implicitly and publicly threatened to quit, though no evidence was provided showing she might be fired or even had been disciplined. Whether the issues ran only one-way, because Blue was a very productive worker and/or because of her apparent popularity with Local 159's members, however, no superior seems to have had the desire (or perhaps temerity) to document any meaningful problems with, much less take materially adverse action toward, Blue until after her protected activity.

[7] Defendant points out that this reasoning in *Washington* is dictum. Regardless, the reasoning is persuasive, logical and particularly applicable to the matter before the court.

Blue contends that she suffered a significant harm when many of her job responsibilities were taken from her and reassigned to other employees, such as opening office mail, working with the apprenticeship program, speaking with members about benefits and processing applications for member benefits along with having to type general office documents, training office staff, sending out notices for meetings and ordering office supplies.  Removing such specific responsibilities might well be minor job changes and viewed separately rise only to the level of "petty slights or minor annoyances."  When all are removed within a month of each other and on the heels of her challenging racial discrimination, a jury could nevertheless find that those actions taken as a whole constitute a significant harm which would dissuade a reasonable employee from altruistically supporting a colleague's discrimination claim.  Such a finding receives additional support when one takes into account that all these responsibilities had been part of the employee's job for over 20 years and had not been altered even when the job title was changed 5 years earlier, along with the fact that the employee's work in all of these areas had never been criticized, nor resulted in any discipline.

Blue also received a handful of warnings after she spoke out against the apparent discrimination.  In some circumstances mere warnings may also not amount to a materially adverse employment action, but the Seventh Circuit has "declined to rule categorically that warnings cannot be adverse actions."  *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840,

---

Further, considering whether the employee was acting altruistically does not lower the materially adverse standard, as defendant fears; it merely provides the proper context in which to consider the significance of alleged retaliatory acts.

849 (7th Cir. 2007). *Cf. Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001) (two warnings without any "tangible job consequence" did not amount to a materially adverse employment action). If one focuses in on only one of the four warnings issued on February 16, 2007, whether that warning is a materially adverse action is genuinely in dispute. When viewing these four warnings together, and in the context of the other adverse job changes, a jury could conclude that a reasonable employee would find such discipline in a single day would dissuade a reasonable employee from participating in a colleague's discrimination case, especially in light of the undisputed fact that all four were later deemed to be unwarranted. (Def.'s Obj. to Pl.'s PFOF, dkt. #38, ¶114.)

The actions that caused Blue to be feel shunned and isolated in the office also could be found to be materially adverse. She avers that beginning in February 2006, Harrelson began speaking with others about firing Blue. While previously office staff had been friendly with Blue, she no longer received a welcome or good-bye from co-workers and was the only office member excluded from private office meetings, also beginning in February 2006. On one occasion during this same period, Harrelson told Shari Brunner, a friend of Blue's, that she should stop speaking with Blue because of the "personal issues" he was having with Blue in the office.

While defendant has produced facts supporting the conclusion that some of Blue's issues with at least one co-worker and Harrelson started before her involvement in the Phillips case, the facts Blue has put in the record create a genuine issue of material fact about whether Harrelson effectively directed staff to shun Blue following her challenging his alleged

discriminatory action.  If there was an attempt to shun Blue, such actions would be materially adverse.  *See*, *e.g.*, *McKenzie*, 92 F.3d at 485 ("It would seem that, under the proper circumstances, an employer who orders other employees not to talk to a Title VII claimant could indeed retaliate against that claimant by, in effect, ordering others to shun her.").

Finally, defendant concedes that the disciplinary suspension Blue received in March 2007 was materially adverse.  *See* Def.'s Br. in Support, dkt. #19, at 4; Def.'s Br. in Reply, dkt. #37, at 4.  The case law supports this concession regarding the five-day suspension Blue received.  *See Russel v. Bd. of Tr. of Univ. of Ill. at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (five-day disciplinary suspension is materially adverse employment action for purposes of prima facie case) (citing *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) (one-week disciplinary suspension is materially adverse) and *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999) (five-day disciplinary suspension is materially adverse)).

## B.    Causality

Under the third prong of the direct method of proving retaliation, plaintiff has the burden of providing sufficient evidence for a jury to find a causal connection between her protected activities and the adverse actions.  Plaintiff may satisfy this burden using either direct or circumstantial evidence.[8]  Direct evidence essentially requires "an actor's admission

---

[8] While the terminology is somewhat confusing given its multiple and, at times seemingly inconsistent uses in labor cases, one may proceed under the direct method without using direct evidence.  *Stephens*, 569 F.3d at 787; *see also Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (despite earlier misleading dictum, use of the direct method does not require direct evidence; circumstantial evidence that is relevant and probative may support any element of a direct case of retaliation).

of discriminatory animus[.]" *Stephens*, 569 F.3d at 787 (citation omitted). As is commonly the case, plaintiff does not have such direct evidence and points instead to circumstantial evidence to establish the causal link. In taking this path, plaintiff may succeed "'by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006)).

In refuting any causal link here, defendant focuses on the time separating any protected activity and the materially adverse actions. While timing is certainly relevant evidence of causation, it is not "dispositive in proving or disproving a causal link." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). "[A] trier of fact could find that the causal relationship existed from much more [than temporal proximity]." *Id.*

Beginning with the loss of job responsibilities, not only did the loss occur within a month of Blue's conversation about the discriminatory treatment of Phillips, but at the same time Harrelson began speaking with others about firing Blue. Defendant again points to facts showing Harrelson's personal relationship with Blue was not good before her January 27th comments. At least for purposes of summary judgment, however, the court must assume Harrelson and Blue had worked together for four and half years without her receiving any criticism or discipline from him for her work performance, including during and after Harrelson's re-election campaign in the face of opposition from Blue. Considering the timing of the removal of Blue's job responsibilities, her previously seemingly unblemished record as an employee, and Harrelson's new statements about wanting to fire Blue, a

reasonable jury could infer that a causal link between Blue's comments and the adverse actions existed.

The alleged shunning of Blue by co-workers and Harrelson also occurred around this same time and under the same circumstances as her loss of job responsibilities. Viewing the facts in a light most favorable to Blue, a reasonable jury could find that Blue had a friendly relationship with most of the other office staff, as well as with Local 159's union members. Assuming a jury would infer as much, it could then reasonably find that the sudden change in how Blue was treated by office staff, in conjunction with Harrelson's negative treatment of and statements about Blue, were all causally connected to Blue's comments and involvement in the Phillips case.

Although the four warnings and the five-day disciplinary suspension occurred about a year after Blue expressed her support for Phillips's case and filed her own retaliation complaint, each occured on the heels of the Madison Equal Opportunity Commission providing Local 159 with notice that it was scheduling a public hearing on Phillips' race discrimination case. In fact, the warnings came a mere two days after the notice was received and the suspension a month later. Besides being close in temporal proximity to the heating up of the discrimination case in which Blue remained involved on behalf of the claimant, it is undisputed that all those disciplinary actions were unwarranted or issued without just cause. In other words, the reasons they were handed out were illusory. Additionally, the five day suspension was not issued in accordance with Local 159's standard disciplinary process. Such circumstantial evidence is enough for a reasonable jury to infer that a causal link

existed between Blue's continuing support for the Phillips case and the issuance of the warnings and suspension.

Defendant attempts to undermine the reasonableness of a causal link by contending that any discipline or loss of responsibility that Blue underwent was at most justified or at least "a result of a sour working relationship between [her] and Mr. Harrelson based on nondiscriminatory grounds that existed long before [her comments]." Def.'s Reply Br., dkt. #37, at 7. And so a jury might find. But a jury could find otherwise in light of the facts on record. A jury could reasonably question why the relationship between Blue and Harrelson did not result in overt discipline until after her actions in support of Phillips, even though they had worked together for four and half years, including a time after Blue had opposed Harrelson's re-election. A jury could also reasonably question why Blue had a 28-year unblemished record on the job until her Phillips comments and why Harrelson did not speak about wanting to fire Blue until after those comments.

While a jury may decide that Harrelson's treatment of Blue was premised on a power struggle within the office,[9] there is sufficient evidence from which it could also reasonably decide that the adverse treatment Blue suffered was the result of retaliation against Blue for speaking out against Local 159's allegedly discriminatory practices toward African Americans. Plaintiff has, therefore, satisfied her burden in overcoming defendant's motion

---

[9] No doubt there is ample evidence in the record of Blue's willingness to confront, if not to be outright insubordinate toward, her supervisors. Nonetheless, deciding whether it was Blue's intractable disposition or her protected activity that caused the materially adverse job actions remains the function of the jury at trial, given that any recalcitrance had not resulted in any documented discipline before she had engaged in protected actions.

for summary judgment.

As the Seventh Circuit has explained,

The fact that the defendant may be able to produce evidence that the plaintiff [suffered a materially adverse action] for a lawful reason just creates an issue of fact: what was the true cause of the [action]?  Evidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial unless the defendant can produce *uncontradicted* evidence that he would have [taken such action toward] plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm.

*Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 643 (7th Cir. 2002) (emphasis and alterations added).  Plaintiff has presented evidence from which a jury could find that the cause of the materially adverse actions was retaliation against the protected activity and defendant has not produced uncontradicted evidence that the actions would have occurred otherwise.  At least on this record, it is up to the jury, not this court, to decide the true cause.

ORDER

IT IS ORDERED that defendant's motion for summary judgment (dkt. #18) is DENIED.

Entered this 15th day of July, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge